*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
:
**ERIC PHELPS**,                                    :
:
      Plaintiff,                          :
:      Civ. Action No.: 15-3146 (FLW)
v.                                                  :
:           **OPINION**
**CAROLYN W. COLVIN, ACTING**              :
**COMMISSIONER OF SOCIAL**                  :
**SECURITY**,                                     :
:
      Defendant.                         :
_____:

**WOLFSON, United States District Judge:**

      Eric Phelps ("Plaintiff") appeals from the final decision of the Acting Commissioner of
Social Security, Carolyn W. Colvin ("Defendant" or "Commissioner"), who denied Plaintiff
disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social
Security (the "Act").  After reviewing the administrative record ("A.R."), the Court finds that the
Administrative Law Judge's ("ALJ") determinations were based on substantial evidence and,
accordingly, affirms the decision.

**I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

      Plaintiff was born on August 5, 1986, and was 25 years old on his alleged disability onset
date of January 1, 2012.  On April 18, 2012, Plaintiff filed applications for DIB and SSI alleging
that he was disabled based on his bipolar manic psychosis and substance abuse disorder.  Those
applications were denied, and Plaintiff requested reconsideration, which was also denied.
Plaintiff appealed and requested a hearing before an ALJ.  On March 14, 2014, a hearing was

held before ALJ Dennis O'Leary. On May 29, 2014, the ALJ issued a written opinion, finding

that Plaintiff was not disabled. Plaintiff appealed that decision to the Appeals Council, which

denied his request for review. Having exhausted his administrative remedies, Plaintiff filed his

Complaint in the instant action.

a.     **<u>Work Activity and Function Reports</u>**

In his work history report, Plaintiff stated that he worked as a line cook and food handler.

A.R. at 211. Starting in 2009, Plaintiff worked as a line cook at Aramark where he prepared

"lunch menu items for employee purchase in company cafeteria." <u>Id.</u> at 211, 215. In 2010,

Plaintiff was employed as a line cook at Nutrition Management Services. <u>Id.</u> at 211. That same

year, Plaintiff began working for Compass Group USA, Inc. ("Compass Group") as a line cook,

where he made both "lunch and dinner items for residents in private assisted living facility." <u>Id.</u>

at 211, 213. In 2011, Plaintiff was promoted to food handler at Compass Group and, as a result,

he was responsible for preparing "mostly sandwiches" that were "shipped out to vending

machines." <u>Id.</u> at 211-12.

In his function report, Plaintiff stated that he is currently living in a group home, and

explained that "[he] wake[s] up[,] go to program for 7 hours. Then come home eat[;] then go to

an AA meeting[;] then go to sleep." <u>Id.</u> at 266. Plaintiff states that he frequently cooks meals

and performs household chores, such as "cleaning [and] laundry." <u>Id.</u> With respect to social

activities, Plaintiff reports that he eats with his roommates at the group home "every so often,"

and that he attends "AA/ NA meetings." <u>Id.</u> at 270. According to Plaintiff, he is able to follow

written instructions "the best [he] can," and he can follow spoken instructions well. <u>Id.</u> at 271.

In regard to his job at Compass Group, Plaintiff explained that he was terminated because he

"couldn't go in everyday." <u>Id.</u> at 272.

**b.** **Review of the Objective Medical Evidence**

 **1.**  **Medical Records**

In 2009, Plaintiff was hospitalized on five occasions for mental health issues triggered by drug usage.  On January 19, 2009, Plaintiff was admitted to the Carrier Clinic "for homicidal threats toward [his] family."  Id. at 353.  In the discharge summary, Paul Goodnick ("Dr. Goodnick"), M.D., diagnosed Plaintiff with "Bipolar I, mania" and adjusted his medication regimen.  Id. at 353-54.  Dr. Goodnick noted that, after several days of treatment, "[Plaintiff] stated he was taking his medication and was feeling a lot better."  Id. at 354.  Dr. Goodnick observed that "[Plaintiff] sounded positive and was friendlier to nursing staff," and that "[h]e was doing better" and his "mood [was] balanced."  Id.

On March 15, 2009, Plaintiff was admitted to the Carrier Clinic for "delusions and threatening behavior" directed at his parents.  Id. at 314.  Dr. Goodnick reported that Plaintiff thinks his parents are withholding "millions of dollars" in inheritance from his deceased grandmother, so "[h]e stalk[ed] parents around the house and blocked mother from leaving the bedroom until she gave him money."  Id.  A couple days later, Plaintiff was released from Carrier Clinic, and Dr. Goodnick noted that "[Plaintiff] said he would not use marijuana which seems to be the major trigger in his behavioral disturbances and will stay on medication."  Id. at 315.  Plaintiff admitted, in June 2009, that he consumed approximately one gram of marijuana every day for the past six years.  Id. at 285.

On August 11, 2009, Plaintiff was admitted to the Princeton Healthcare Systems.  Id. at 426-27.  In the discharge summary, Richard Prus-Wisniewski ("Dr. Prus-Wisniewski"), M.D., stated that Plaintiff was diagnosed with a "[s]chizoaffective disorder, cannabis dependence, [and] nicotine dependence."  Id. at 426.  The doctor stated that "[P]laintiff did report a history of 2

years of mood swings with racing thoughts and irritability," and that "[h]e remained delusional that his brother might get with his ex-girlfriend…." Id. at 426, 430. Dr. Prus-Wisniewski stated that "[Plaintiff] was strongly advised not to use [] marijuana, given that it might worsen his psychosis and delusions." Id. at 426.

On August 27, 2009, Plaintiff was readmitted to the Princeton Healthcare Systems. Id. at 415-16. In the discharge summary, Dr. Prus-Wisniewski stated that "MD spoke to [Plaintiff's] father who felt that [Plaintiff] was doing better after [] the prior discharge for 2 days and then [Plaintiff] went… to get some marijuana and that is when he became aggressive and sat on the family's car and they called 9-1-1." Id. at 415. Dr. Prus-Wisniewski stated that Plaintiff agreed to start a treatment program, and that "[h]e was tolerating his medications well and he was discharged on his medications," including Abilify, Cogentin, Inderal, Depakote, Doxycycline, Vistaril and Paxil. Id.

On September 11, 2009, Plaintiff was committed to the Hagedorn Psychiatric Hospital because "[Plaintiff] [was] highly paranoid that his parents [were] keeping his inheritance money from him so… he [became] irritable, angry, threatening them, following them and barricading his parents in the home, as well as in the car." Id. at 442. Dr. Lourdes Montezon ("Dr. Montezon"), M.D., noted that "[Plaintiff] has also been smoking pot excessively," and that "[he] started using cannabis at 16." Id. at 442-43. The doctor stated that Plaintiff was prescribed Depakote, Abilify, Cogentin, Haldol and Vistaril. Id. at 447. With respect to his condition on discharge, Dr. Montezon explained that "[Plaintiff] appears to be alert, fairly groomed, friendly and pleasant with stable mood noted and with no signs of psychosis or paranoia noted." Id. at 449. Plaintiff was diagnosed with bipolar disorder and cannabis dependence. Id.

On December 2, 2009, Plaintiff visited Dr. Henry B. Odunlami ("Dr. Odunlami"), a psychiatrist at Genpsych, who noted that Plaintiff has an anger management issue that "manifests itself as harsh, angry words." Id. at 555. Dr. Odunlami also reported that "[Plaintiff] has a history of marijuana abuse," and that "[h]e uses a few times per week," including "using some hours ago." Id. at 556. A mental status examination revealed that Plaintiff did not have any serious abnormalities. Id. His speech was normal, and his language skills were intact. Id. Plaintiff denied any suicidal thoughts, hallucinations and delusions. Id. Dr. Odunlami found that Plaintiff's behavior was generally appropriate, and that his thinking was logical, and his thought content was appropriate. Id. Plaintiff displayed no signs of anxiety or hyperactivity. Id. Plaintiff was diagnosed with "Major Depressive Disorder, Recurrent, Severe with Psychotic Features" and "Cannabis Dependence." Id. at 557.

On December 23, 2009, Plaintiff visited Dr. Odunlami, who reported that "[Plaintiff's] behavior has been stable and uneventful and he denies any psychiatric problems or symptoms." Id. at 558. Dr. Odunlami stated that Plaintiff's "[m]ood was euthymic with no signs of depression or elevation." Id. The following month, on January 26, 2010, Dr. Odunlami reported that "[Plaintiff] denies all psychiatric problems." Id. at 560. However, on March 2, 2010, Plaintiff saw Dr. Odunlami, who reported that Plaintiff was "[u]sing ½ a gram of [marijuana] daily... [and] says that he [is] not willing to stop it...." Id. at 562. Nevertheless, Dr. Odunlami determined that Plaintiff suffered from a depressive disorder and cannabis abuse. Id.

On May 12, 2010, Plaintiff told Dr. Odunlami that he suffers from paranoia "and [said] that [marijuana] makes him very paranoid." Id. at 569. Additionally, Plaintiff stated that he experiences "[b]izzare or magical thoughts" and "[h]as severe mood swings with ups and downs and irritability." Id. Dr. Odunlami stated that Plaintiff has abused marijuana "for years," and

that "[he] reports that his last use was hours ago." Id. Dr. Odunlami stated that "[Plaintiff] has also abused alcohol." Id. With respect to his mental status, Dr. Odunlami stated that "[t]here are no signs of hallucination, delusions, bizarre behaviors, or other indicators of psychotic process." Id. at 570. Indeed, the doctor found that "[Plaintiff] is fully oriented." Id. Plaintiff was diagnosed with major depressive disorder, and he was instructed to continue with his medicine regimen of Depakote, Abilify and Cogentin. Id. at 570-71.

On June 22, 2010, Dr. Odunlami reported that Plaintiff has been taking his medication regularly and his "behavior has been stable and unremarkable." Id. at 572. On July 28, 2010, Plaintiff visited Lydia Kelse ("Dr. Kelse"), a psychiatrist at Genpsych, who noted that Plaintiff had improved. Id. at 581. Specifically, Plaintiff had no symptoms of anxiety or depression and was feeling better and attending group therapy sessions. Id. Dr. Kelse noted that Plaintiff also denied any substance use. Id. A mental status examination revealed normal findings. Id. Dr. Kelse diagnosed Plaintiff with major depressive disorder, and continued Plaintiff on his medication regimen. Id. at 581-82.

On August 18, 2010, Plaintiff saw Ngozi Nwobi ("Nwobi"), a nurse practitioner at Genpsych, who reported that Plaintiff was in a "good mood." Id. at 578. Nwobi reported that Plaintiff denies substance abuse, as well as the temptation or craving to smoke marijuana.[1] Id. With respect to his mental status, Nwobi found that Plaintiff was "euthymic with no signs of depression or manic process," so his diagnoses were unchanged and his medications were continued. Id. On September 16, 2010, Plaintiff visited Nwobi, again, who found that "[m]edication has been regularly taken as prescribed and behavior has been stable." Id. at 576. Indeed, the nurse practitioner reported that "[n]o psychiatric complaints [were] made." Id.

---

[1] However, Plaintiff's mother informed Nwobi that her son continued to use marijuana. Id.

However, Plaintiff requested a decrease in his medications because of "low energy," so Nwobi decreased his dosage of Abilify.  Id.

On November 8, 2010, Nwobi reported that "Plaintiff did not show up for appointment," but his "[p]arents said he has been taking the Space drugs and can't function."  Id. at 574. Nwobi recommended that "[Plaintiff] be sent to a long term drug rehab place."  Id.  On December 6, 2010, Plaintiff saw Maryann Minischetti ("Minischetti"), an advanced nurse practitioner at Genpsych.  Id. at 602-04.  Minischetti reported that "[Plaintiff] is guarded, becomes angry when asked about drug use [and] refused [a urine drug screen]."  Id. at 602. However, she noted that Plaintiff denied substance abuse.  Id.

In January 2011, Plaintiff saw Minischetti on three separate occasions.  Id. at 596-601. On January 5, 2011, Minischetti noted that Plaintiff admitted to smoking synthetic marijuana (also referred to as "K2" or "Spice"), and she found that Plaintiff exhibited mild depressive symptoms and anxiety.  Id. at 600.  Minischetti diagnosed Plaintiff with major depressive disorder and cannabis dependence.  Id.  On January 24, 2011, Minischetti stated that "[Plaintiff] smoked a couple of days ago" and complained of anxiety.  Id. at 598.  On January 31, 2011, Minischetti reported that Plaintiff "keeps asking for benzos," but she stated that "benzos would not be given."  Id. at 596.  Indeed, Minischetti stated that Plaintiff was "[o]verly polite, somewhat manipulative, [and] states he has not smoked [synthetic marijuana] for one week."  Id. Plaintiff was then prescribed Buspar and his dosage of Vistaril was increased.  Id. at 596-97.

On February 14, 2011, Plaintiff visited Minischetti, and she reported "confront[ing] [Plaintiff] about leaving group [therapy] early last Thursday, makes excuses, told if he leaves again he will probably be discharged."  Id. at 592.  At that evaluation, Plaintiff denied substance abuse, and Minischetti found that he did not "express depressive thoughts."  Id.  However, she

also noted that Plaintiff "[r]emains manipulative [and] overly polite." Id. On February 23, 2011, Minischetti reported that "[Plaintiff] stopped [using synthetic marijuana] two days ago but is feeling some withdrawal from [it]." Id. at 590. However, Plaintiff denied abusing any other substances, as well as any psychotic symptoms. Id. Minischetti indicated that Plaintiff's insight and judgment was "fair at best," and that he needed direction and support. Id.

On March 2, 2011, Minischetti reported that Plaintiff had relapsed and smoked synthetic marijuana after "manag[ing] to stay clean for one week only." Id. at 588. Minischetti noted that, although Plaintiff was in a good mood, he experienced some anxiety. Id. The nurse practitioner continued Plaintiff on his medication regimen without adjustments. Id. at 588-89. On March 7, 2011, Minischetti noted that Plaintiff was still smoking synthetic marijuana, and that "he needs it for anxiety, but cannot state what the anxiety is about." Id. at 585. Minischetti increased Plaintiff's dosage of Buspar. Id. at 586. On March 16, 2011, Plaintiff visited Minischetti, who reported that Plaintiff had smoked synthetic marijuana over the past weekend, but that Plaintiff had read an "article about [synthetic marijuana], [and] stated it opened his eyes [because] he did not realize people had been killed from [synthetic marijuana]." Id. at 583. Minischetti explained that Plaintiff "[s]eems to relapse on [synthetic marijuana] over weekends." Id.

On March 22, 2011, Plaintiff was admitted to Seabrook House for substance abuse treatment, and he was diagnosed with a depressive disorder, an anxiety disorder, and cannabis and nicotine dependence. Id. at 504-08. The discharge summary states that Plaintiff said "he has been doing his drug of choice for too long now." Id. at 507. During his treatment, Plaintiff attended group therapy sessions. Id. On April 7, 2011, Plaintiff returned to Seabrook House for substance abuse treatment. Id. at 509. Records reveal that Plaintiff admitted drinking alcohol twice a month for the past eight years; smoking three grams of marijuana daily for the past seven

years, as well as two grams of synthetic marijuana daily for one year; and, ingesting bath salts at least once a week for the past year. Id. at 521, 533. Plaintiff reportedly stated that he needed help with his addiction because "[he] cannot seem to stop on his own." Id. at 521. On July 29, 2011, Plaintiff started substance abuse treatment at Seabrook House, again. Id. at 532. The medical reports reveal that Plaintiff suffered from cannabis and hallucinogen dependence and alcohol abuse. Id. Plaintiff stated that "he would like to continue his sobriety and learn more about addiction." Id. at 533. Despite that sentiment, on October 11, 2011, Plaintiff "[l]eft treatment to live with a young woman [that] he met in the rooms of AA/NA." Id. at 535.

Approximately four months after he left Seabrook House, Plaintiff entered substance abuse treatment at Summit Oaks Hospital ("Summit Oaks") on February 16, 2012. Id. at 537. Susan Borja ("Dr. Borja"), M.D., reported that Plaintiff was admitted because he became aggressive with his parents and punched a hole in their wall when they refused to buy Plaintiff a pack of cigarettes. Id. at 537-38. Plaintiff was diagnosed with "Bipolar Disorder, Mixed, Cannabis Dependence, Continuous." Id. at 537. Dr. Borja noted that Plaintiff "reports that he has been abusing synthetic marijuana for over a year and smok[es] 4 grams per day." Id. at 538. Plaintiff was advised to follow-up at Hunterdon Behavioral Health. Id. at 539.

On March 23, 2012, Plaintiff visited Dr. Odunlami at Genpsych, who reported that Plaintiff admitted to abusing marijuana and synthetic marijuana. Id. at 564. Indeed, Dr. Odunlami stated that Plaintiff had used synthetic marijuana hours before the evaluation, and appeared to be "high." Id. at 564, 567. Dr. Odunlami reported that "[Plaintiff] has [also]... abused crack cocaine, ecstasy [and] hallucinogens." Id. Plaintiff admitted that he drinks alcohol and has snorted bath salts, which Dr. Odunlami referred to as "synthetic amphetamines." Id. at 565. Dr. Odunlami determined that "[Plaintiff] has symptoms of anxiety" and "reports fears of

losing control or of dying." Id. at 564. Plaintiff also described "[s]ensations of excessive muscular tension," and is restless and irritable. Id. Plaintiff was diagnosed cannabis and synthetics dependence. Id. at 567. Dr. Odunlami stated that Plaintiff has "a history of medication non-compliance," and that "[h]e stopped taking his antidepressants last month because he was feeling better." Id. Dr. Odunlami informed Plaintiff about the importance of taking his prescribed medication. Id. at 567-68.

In April 2012, Plaintiff was enrolled in a partial care program at Genpsych. Id. at 685. Carly DeCotiis ("DeCotiis"), a licensed professional counselor, noted that Plaintiff was admitted into "the program for substance abuse, labile moods and volatile behavior." Id. Although he was supposed to attend 25 hours of group therapy, DeCotiis reported that Plaintiff had poor attendance, and that he was ultimately discharged after "[he] came to the program under the influence" and refused to provide a urine sample for a drug screen. Id. According to DeCotiis, "when [the doctor] met with [Plaintiff], she recommended a higher level of care – long term residential detox program." Id.

On April 21, 2012, Ryan DiMeglio ("DiMeglio"), a counselor at Endeavor House, performed an intake evaluation on Plaintiff. Id. at 689-97. DiMeglio reported that Plaintiff entered this substance abuse program because his "[f]amily intervened and stated that [Plaintiff] needed to get treatment." Id. at 689. DiMeglio noted that, although Plaintiff denied psychosis, he experienced "anxiety, cannabis abuse, and depression." Id. During the evaluation, Plaintiff admitted that he abuses marijuana and synthetic marijuana, but that his "drug of choice" is synthetic marijuana. Id. at 690. Indeed, Plaintiff stated that he had smoked synthetic marijuana before the intake evaluation. Id.

With respect to his mental status, DiMeglio found that Plaintiff was well oriented with a bland affect. Id. at 696. His "[m]ood [was] anxious and depressed," and "[h]e presented himself in a disheveled fashion." Id. According to DiMeglio, Plaintiff made sufficient eye contact, and his speech was logical and coherent. Id. Plaintiff appeared fidgety and displayed a mild degree of conceptual disorganization. Id. Plaintiff also exhibited poor judgment. Id. However, his attitude was open and cooperative, and his attention and concentration were intact. Id. DiMeglio diagnosed Plaintiff with cannabis dependence and bipolar disorder. Id. Nevertheless, Plaintiff was discharged four days later against medical advice, because the program was "too intense." Id. at 698-99.

In October 2012, Plaintiff was a patient at Integrity House, a substance abuse facility, but he decided to go to Bergan Regional for inpatient treatment. Id. at 711, 716. Following his discharge from Bergan Regional, Plaintiff began treatment at the Gateway Day Treatment Program in November 2012. Id. at 707. Records reveal that, at that time, Plaintiff was prescribed Depakote, Cogentin, Risperidone and Buspirone. Id. at 711. His intake assessment reports that "[Plaintiff] was abusing [synthetic marijuana] which activated his illness," since "[h]e was using it daily for almost 3 years in addition to cannabis." Id. at 720. In addition, the records state that, even though "[Plaintiff] was having repeated psychotic episode and even on medications," he "continued to use cannabis and [synthetic marijuana]." Id. Plaintiff was diagnosed with a psychotic disorder, hallucinogen and cannabis dependence with a history of cocaine abuse. Id. at 717.

In August 2013, Sahar Kousa ("Dr. Kousa"), a psychiatrist, did an intake evaluation at CPC Behavioral Healthcare ("CPC"). Id. at 727-36. Dr. Kousa reported that Plaintiff has been living at Easter Seals, a group home, for approximately ten months. Id. at 728. Plaintiff stated

that he did not abuse any substances for nine months, but he recently relapsed on several occasions. Id. at 728-29. Dr. Kousa reported that, when Plaintiff was medicated, there was no psychosis. Indeed, Plaintiff stated that "[he is] fine on meds even if [he] use[s]," but he could not remember "how he feels without meds but on drugs." Id. Dr. Kousa found that Plaintiff has a long history of "substance abuse/dependence," and that he "presents with [symptoms] of manic/hypomanic [symptoms] with and without using [drugs]," but has "periods of psychosis when off antipsychotics." Id. at 735.

Dr. Kousa performed a mental status examination, which revealed that Plaintiff was cooperative with good eye contact. Id. at 732. His thought process was linear with no abnormal thought content. Id. Plaintiff denied any hallucinations, and his mood was "good" and his affect was euthymic, reactive, and appropriate. Id. at 732-33. Plaintiff was fully oriented and was able to identify similarities and explain proverbs. Id. at 733. His memory was intact and he displayed average intelligence and good insight and judgment. Id. Dr. Kousa noted that Plaintiff stated, "I do well as long as I take my medications." Id. Plaintiff was diagnosed with bipolar disorder, attention deficit hyperactivity disorder, substance dependence and substance induced anxiety disorder. Id. Dr. Kousa noted that Plaintiff was on Depakote, Risperdal, Buspar and Cogentin. Id. at 736.

On September 24, 2013, Ira Hays ("Hays"), a licensed social worker at CPC, performed a biopsychosocial assessment on Plaintiff. Id. at 737-49. Hays noted that Plaintiff was living at Easter Seals, and that "he has been attending Community Connections for almost a year and wants to change programs as he feels that [it] is 'not working' and is 'repetitive.'" Id. at 743, 748. Hays noted that Plaintiff has a history of mental illness and substance abuse, but "[he] denies any history of or current psychosis or suicide attempt." Id. at 748. However, Plaintiff

stated that he experiences "symptoms of depression including feelings of sadness, periods of poor motivation and not following through on things," as well as "anxiety including finding it hard to sit still and fidgeting." Id.

During the biopsychosocial assessment, Hays performed a mental status examination. Id. at 744-46. According to Hays, Plaintiff was cooperative and well-groomed with average eye contact and clear speech. Id. at 744. Plaintiff displayed no signs of hallucinations or delusions, and his thought process was logical. Id. at 744-45. Hays found that Plaintiff had a full affect, but an anxious and depressed mood. Id. at 745. His ability to think abstractly was intact, but he reported problems with memory and concentration. Id. Hays determined that Plaintiff has average intelligence with good insight and judgment. Id. at 746. Plaintiff was diagnosed with bipolar disorder, an anxiety disorder and a substance dependency. Id.

On November 7, 2013, Plaintiff visited Dr. Kousa, and Plaintiff reported medication compliance and that "[he] feel[s] better, anxiety is not as bad as it used to be." Id. at 753. A mental status examination revealed that Plaintiff was alert, calm, and cooperative. Id. His speech was fast, but otherwise normal. Id. Dr. Kousa found that Plaintiff was in a good mood, and his affect was congruent and broad. Id. Plaintiff was fully oriented, and his thought form was logical and linear. Id. Plaintiff denied any hallucinations or delusions, and Dr. Kousa found that his insight and judgment were good. Id. Plaintiff was diagnosed with a bipolar disorder, an anxiety disorder and a substance dependence. Id.

### 2.    State Agency Medical Opinions

On July 25, 2012, Kim Arrington ("Dr. Arrington"), a consultative psychologist, examined Plaintiff, and the doctor reported that Plaintiff had been participating in Integrity House, a substance abuse program, for the past twenty days. Id. at 700-01. During the

examination, Plaintiff reported that he experiences "dysphoric moods, fatigue, difficulty concentrating, isolating himself from others, and irritability." Id. at 700. Plaintiff also reported that "[h]e makes careless mistakes and is impulsive." Id. at 701. Dr. Arrington found that Plaintiff was cooperative with adequate social skills, and that he was casually dressed with fair hygiene and grooming. Id. Plaintiff made appropriate eye contact, but his motor behavior was restless. Id. His speech was fluent and clear with adequate language. Id. Dr. Arrington determined that Plaintiff appeared coherent and goal directed, and there was no evidence of hallucinations, delusions or paranoia. In addition, his affect was restricted, and his mood was dysthymic. Id. However, Dr. Arrington stated that "[Plaintiff's] judgment ranges from fair to poor due to mood fluctuations." Id. at 702.

After performing tests on his intellectual functioning, Dr. Arrington concluded that "[Plaintiff] is able to follow and understand simple directions and instructions," but had difficulty maintaining attention and concentration. Id. Indeed, Dr. Arrington found that "[Plaintiff] will have difficulty learning new tasks and performing complex tasks independently." Id. Thus, Dr. Arrington opined that "[t]he results of the present evaluation appear to be consistent with psychiatric problems, which may significantly interfere with [Plaintiff's] ability to function on a daily basis." Id. Dr. Arrington recommended that "[Plaintiff] continue with his current substance abuse program," and that "he continue with his current psychiatric treatment as well." Id. Plaintiff diagnosed attention deficit hyperactivity disorder, polysubstance abuse, and substance-induced mood disorder. Id.

In August 2012, Michael Dadamo ("Dr. Dadamo"), a state agency psychologist, opined that Plaintiff suffered from the following severe impairments: substance abuse disorder and attention deficit disorder and attention deficit hyperactivity disorder. Id. at 63, 80-81. Although

Dr. Dadamo did not personally examine Plaintiff, the doctor reviewed the medical evidence in the record, including the findings and opinions of Dr. Arrington. Id. at 64. Dr. Dadamo concluded that Plaintiff was "moderately limited" in his ability to remember locations, work procedures and detailed instructions. Id. at 65. However, Dr. Dadamo concluded that Plaintiff was "not significantly limited" in his ability to understand, remember and carry out very short and simple instructions. Id. In fact, Dr. Dadamo found that Plaintiff was "not significantly limited" in his ability to carry out detailed instructions. Id. Dr. Dadamo additionally determined that Plaintiff was "moderately limited" in his ability to sustain concentration and persistence, including some limitations in regard to "maintain[ing] regular attendance and be[ing] punctual within customary tolerances." Id. In conclusion, Dr. Dadamo opined that Plaintiff is "best equipped" for work with two or three step directions, and that "[h]e is able to focus adequately upon routine job tasks." Id. Dr. Dadamo opined that "[l]imitations in stress tolerance and practical judgment limit [Plaintiff] to jobs where the changes in routine are modest and he does not have to exercise a lot of independent judgment." Id. at 66. Ultimately, Dr. Dadamo opined that Plaintiff is not disabled. Id. at 67. In March 2013, Ellen Gara ("Dr. Gara"), a state agency psychiatrist, confirmed the opinion of Dr. Dadamo. Id. at 94, 115.

### c.     Review of the Testimonial Record

#### 1.     Plaintiff's Testimony

Plaintiff testified that he is twenty-five years old. Id. at 28. While in high school, Plaintiff worked as a deli clerk at Steck's Delicatessen for approximately four years. Id. at 28, 44. He worked "[r]oughly five hours a day" and about "[f]our to five days a week." Id. at 28. However, Plaintiff left Steck's to go to culinary school, where he earned an associate degree. Id. at 28, 44. Plaintiff testified that his last job, at Compass Group, was terminated "[d]ue to [his]

dual diagnosis; my mental illness." <u>Id.</u> at 29. Plaintiff clarified that his "dual diagnosis" refers to his "bipolar depression anxiety, and addiction to marijuana." <u>Id.</u> at 30.

Based on his illnesses, Plaintiff stated that he has been involuntarily committed to the hospital on "[a]t least five; five to six" occasions. <u>Id.</u> The first time Plaintiff was involuntarily committed was "roughly around the age of 22," but, at the time of the hearing, the most recent commitment "was probably about two years ago." <u>Id.</u> at 29-30. With respect to the cause of his last involuntary commitment, Plaintiff explained, "I feel as if I wasn't right on my medications, and I have to get them regulated." <u>Id.</u> at 30.

Plaintiff testified that he was twenty-two years old when he was diagnosed with bipolar disorder, and that he still experiences both manic and depressive episodes. <u>Id.</u> at 32. Plaintiff stated that his longest depressive episode was "[r]oughly a month; maybe a month" and it lasted "[q]uite a few days." <u>Id.</u> at 33. Plaintiff explained, "I don't feel like getting out of bed. I just don't feel like being active in any way, shape, or form." <u>Id.</u> Conversely, Plaintiff testified that he also experiences manic episodes "[m]aybe a couple of times a week" and he gets "these high moments." <u>Id.</u> According to Plaintiff, "I'm just very up, excited; feel like I'm on the top of the world type of feeling. But then it goes away and [] I get very drained." <u>Id.</u> at 33-34.

During manic episodes, Plaintiff testified that he "mak[es] poor decisions," such as "[u]sing marijuana or something like that." <u>Id.</u> at 34. Plaintiff stated that, while he has abused other substances, his "drug of choice" is marijuana or synthetic marijuana. <u>Id.</u> at 35. However, Plaintiff claimed that he had not used marijuana or synthetic marijuana in "[o]ver a year." <u>Id.</u>

Plaintiff testified that he currently attends CPC Behavioral Healthcare for mental health treatment, including group counseling, and that he goes "five days a week, Monday through Friday." <u>Id.</u> at 35-36. Plaintiff explained that he has "been in [the] program for over a year and

a half now." Id. at 36. After starting his treatment, Plaintiff stated that he is feeling better, and that "[i]t's very rare that I get a manic episode now." Id. at 37. However, Plaintiff further stated that "I still get [depressive episodes] from time to time." Id.

Plaintiff is prescribed "Haldol, BuSpar, Depakote, and Cogentin." Id. at 36. Plaintiff stated that his current medication regimen is better than past regimens, but the doctors at CPC are "still experimenting [with the proper combination of medication and dosages] because [his] anxiety level is through the roof at some points." Id. at 40. Indeed, Plaintiff declared that "[i]t's very hard to function with [his] anxiety" because he experiences "tremors, sweaty palms, crawling out of [his] skin." Id. at 40-41.

In regard to his living situation, Plaintiff testified that he has lived in a group home "for over a year and a half now." Id. at 38. At the house, Plaintiff stated that he is responsible for various chores, including "cleaning the house, do[ing] [] laundry, making [] beds, just cleaning. Stuff like that." Id. Plaintiff enjoys listening to music, cooking and "talking to girls." Id. On the weekends, Plaintiff stated that his "family comes down… [a]nd they take [him] out for, like, dinner or lunch. And then [they] go grocery shopping; sometimes [they] go walk around the mall." Id. at 42-43. Plaintiff explained that, based on the rules at the group home, he is "not really allowed to go out with anyone" other than his parents. Id. at 43.

Finally, at the hearing, the ALJ asked Plaintiff whether he would be able to resume his former job as a deli clerk, and Plaintiff responded that, "[t]o be honest, your honor, I don't think I would be able to do it at this point due to the fact that I don't think I'd be able to hold the job because some days I would probably have to miss." Id. at 45. Plaintiff testified that his "mental illness is overbearing at some points," and that he experiences "anxiety working around people; my depression." Id. Nevertheless, Plaintiff stated that, although he still suffers from depressive

episodes, "I'm kind of forced to go into the program" because he "can't stay at the [group home] during the day."  Id.

### 2. Vocational Expert's Testimony

Patricia Sheshon ("Sheshon"), a vocational expert, also testified at the hearing.  Id. at 46-49.  Sheshon testified that Plaintiff had previously worked as a deli clerk, cook and food assembler.  Id. at 47.  The ALJ then asked Sheshon to assume a hypothetical individual who was able perform a full range of work at all exertional levels, but had the following non-exertional limitations:

> As a result of the combined effects of depression and/or medication side effects, the individual would be restricted to jobs of a simple and repetitive nature involving one or two step processes for completion.  In other works, unskilled work.  And also assume that the individual would be restricted to jobs that do not involve direct contact with the public.

Id.  Sheshon opined that Plaintiff could not perform his past relevant work, but he could perform the following jobs that exist in significant numbers in the national economy, including: (i) a machine feeder – Dictionary of Occupational Titles ("DOT") 699.686-010; (ii) laborer, salvage – DOT 929.687-022; and (iii) cleaner II – DOT 919.687-014.  Id.

In addition, the ALJ asked Sheshon to "assume additionally the individual would, for a variety of reasons, not be able to work three or more days per month on an unscheduled basis." Id.  Sheshon concluded that, based on that additional limitation, there would be no jobs for such an individual.  Id.  The ALJ then asked Sheshon that, "if... an individual would not be able to stay on task for 15 or more percent of the workday for any reason, would I be correct in assuming that there would be no jobs that such a person could perform?"  Id.  Sheshon agreed and concluded there would be no jobs.  Id. at 49.

### d. Review of the ALJ's Decision

The ALJ issued his written decision on May 29, 2014. Id. at 11-18. The ALJ found that "[Plaintiff] is under a disability, but that a substance abuse disorder is a contributing factor material to the determination of disability." Id. at 12. Stated differently, the ALJ concluded that Plaintiff is not disabled under the Act, "because [he] would not be disabled if he stopped the substance use." Id. at 12, 18.

In reaching that determination, the ALJ found that Plaintiff's date of last insured was September 30, 2012, and that Plaintiff has not been engaged in substantial gainful activity since January 1, 2012, the alleged onset date. Id. at 14-15. The ALJ concluded that Plaintiff suffered from two severe impairments: (i) bipolar disorder, and (ii) a substance abuse disorder. Id. at 15. Indeed, the ALJ determined that "[Plaintiff's] impairments, including the substance abuse disorder, meet section 12.04 of 20 CFR Part 404, Subpart P, Appendix 1." Id. The ALJ explained that "[i]t is clear that [Plaintiff] has a severe mental impairment but it is also clear that drug and alcohol abuse is a material part of the impairment." Id.

With respect to step four, the ALJ concluded that, if Plaintiff stopped his substance use, "[he] would have the residual functional capacity to perform a full range of work at all exertional levels," but "he is [only] able to perform work which is simple and repetitive with no direct contact with the public." Id. at 13, 17. The ALJ reasoned that, "[a]lthough [Plaintiff] has been hospitalized on several occasions, all of these were associated with drug abuse; he has admitted to use of multiple types of street drugs." Id. at 16. However, "[w]hen detoxed and stabilized, [Plaintiff's] thought and cognitive processes were mostly normal." Id. Put differently, "[Plaintiff] is essentially symptom free" when he follows his medication regimen. Id. As a result, the ALJ concluded that "[Plaintiff] would be able to work without consideration of his

substance abuse," since "[t]he record clearly shows that when he sobers up he is functional with few apparent mental problems." Id. at 17.

The ALJ concluded that Plaintiff would not be able to perform his past relevant work "as a cook which involved more than simple tasks and constant contact with others," but the ALJ determined, based on the testimony of the vocational expert, that Plaintiff could perform the following jobs, which exist in significant numbers in the national economy: (i) a machine feeder – Dictionary of Occupational Titles ("DOT") 699.686-010; (ii) laborer, salvage – DOT 929.687-022; and (iii) cleaner II – DOT 919.687-014. Id. at 17-18.

## II.    STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); see Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the

evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. See Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. See 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…." 42 U.S.C. § 423(d)(1)(A); see Plummer, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. Id. at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. See 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." Id. at § 404.1520(a); see Bowen v. Yuckert, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. See 20 C.F.R. § 404.1520(b); see also Bowen, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination

of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); see Bowen, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." Id. A claimant who does not have a severe impairment is not considered disabled. Id. at § 404.1520(c); see Plummer, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. pt. 404, subpt. P., app. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. See id. at § 404.1520(d); see also Bowen, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. See 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. Id. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. Williams, 970 F.2d at 1186. If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); Bowen, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); Bowen, 482 U.S. at 141-

42.  The claimant bears the burden of demonstrating an inability to return to the past relevant

work.  Plummer, 186 F.3d at 428.  Finally, if it is determined that the claimant is no longer able

to perform his or her previous work, the burden of production then shifts to the Commissioner to

show, at step five, that the "claimant is able to perform work available in the national economy."

Bowen, 482 U.S. at 146-47 n.5; Plummer, 186 F.3d at 428.  This step requires the ALJ to

consider the claimant's residual functional capacity, age, education, and past work experience.

20 C.F.R. § 404.1520(f).  The ALJ must analyze the cumulative effect of all the claimant's

impairments in determining whether the claimant is capable of performing work and not

disabled.  Id.

## III.	DISCUSSION

Plaintiff makes two arguments on appeal as to why the ALJ's disability determinations

are unsupported by substantial evidence.  First, Plaintiff contends that the ALJ failed to properly

weigh the medical evidence, since Plaintiff clearly does not have the residual functional capacity

to perform work-related activities, even if he stopped his substance abuse.  Next, Plaintiff

contends that the ALJ failed to construct and propose hypothetical questions to the vocational

expert that accurately portrayed Plaintiff's physical and mental limitations.

### a.	Whether the ALJ Properly Considered the Medical Evidence

Plaintiff takes issue with the ALJ's determination that Plaintiff maintains some residual

functional capacity when he stops abusing drugs and complies with his mediation regimen.

Plaintiff contends that the medical evidence supports the finding that Plaintiff suffers from

various ailments, including depression and anxiety, even when he stops abusing drugs.  For

example, Plaintiff points to his own complaints to medical professionals, as well as Dr.

Arrington's medical report that concluded that Plaintiff's psychiatric problems may interfere with his ability to function on a daily basis.

In a case involving drug or alcohol addiction, "[a]n individual shall not be considered to be disabled… if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C); see Mirabile v. Comm'r of Soc. Sec., 354 Fed. Appx. 619, 622 (3d Cir. 2009). In order to determine whether an addiction is material, "the key factor" is whether the ALJ would still find the claimant disabled if he or she stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b)(1). "The ALJ is to determine which of the claimant's physical and mental limitations would remain if the claimant stopped using drugs or alcohol, and then must determine whether any of the claimant's remaining limitations would be disabling." Ford v. Barnhart, 78 Fed. Appx. 825, 827 (3d Cir. 2003). If the ALJ determines that the claimant's remaining limitations are disabling, then the claimant is "disabled independent of [his or her] drug addiction or alcoholism and [the ALJ] will find that [the] drug addiction or alcoholism is not a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(b)(2)(ii).

Here, the ALJ initially concluded that Plaintiff was disabled, since he suffers from bipolar disorder and a substance abuse disorder.[2] A.R. at 15. However, because Plaintiff has a

---

[2] Plaintiff argues that the ALJ incorrectly found that Plaintiff suffered from both drug and alcohol abuse, since "[t]here is no history of alcohol abuse in the medical record." Pl.'s Br. at p. 16. However, that argument is not supported by the record. While alcohol was not his "drug of choice," the medical evidence reveals that Plaintiff did abuse alcohol. For example, Dr. Odunlami wrote in a 2010 report that "[Plaintiff] has also abused alcohol." A.R. at 569. The following year, records from Seabrook House provide that Plaintiff was diagnosed with cannabis and hallucinogen dependence and "alcohol abuse." Id. at 532. In 2012, Plaintiff informed Dr. Odunlami that he continues to drinks alcohol, as well as snort bath salts. Id. at 565. Therefore, substantial evidence in the record supports the ALJ's finding that Plaintiff abused alcohol.

medically verifiable substance abuse disorder, the ALJ performed a drug and alcohol addiction analysis in which he concluded that Plaintiff is not disabled because "the substance use disorder is a contributing factor material to the determination of disability." Id. at 18. The ALJ specifically found that "[Plaintiff] would be able to work without consideration of his substance abuse problem," and that "[t]he record clearly shows that when he sobers up he is functional with few apparent mental problems." Id. at 17. The ALJ explained that, when he stops using drugs and complies with his medication regime, "[Plaintiff] is essentially symptom free." Id. at 16. Because the ALJ concluded that Plaintiff is able to perform simple and repetitive work without direct contact with the general public, the ALJ determined that Plaintiff is capable of performing jobs in the national economy. Id. at 13, 18.

The record shows that, when Plaintiff abuses illicit substances, his bipolar disorder is agitated, which severely exacerbates his disabling symptoms, such as depression, anxiety, paranoia, delusions, anger and impaired judgment. For instance, in 2009, Plaintiff admitted that he was using a substantial amount of marijuana. Id. at 285, 312, 357, 427. That year, Plaintiff was involuntarily committed on five separate occasions. Specifically, Plaintiff suffered delusions, and he repeatedly directed homicidal threats at his parents, as well as lashed out violently and destroyed property. See id. at 314, 353-54. Dr. Goodnick, who treated Plaintiff regularly, reported that marijuana "seem[ed] to be the major trigger in his behavioral disturbances," and he strongly advised Plaintiff to take his prescribed medication. Id. at 315. Likewise, Dr. Prus-Wisniewski instructed Plaintiff to stop using marijuana, "given that it might worsen his psychosis and delusions." Id. at 426.

In subsequent years, Plaintiff continued to use drugs, including marijuana and synthetic marijuana, on a daily basis. See id. at 423, 521, 533, 562, 564-67, 572, 672, 720. Throughout

his struggle with addiction, Plaintiff attended multiple substance abuse programs, but he often relapsed and started abusing drugs again. See id. at 516, 583, 728-29. In April 2012, Plaintiff attended a substance abuse program at Genpsych, but he was discharged when he showed up under the influence of drugs. Id. at 685. That same year, Plaintiff started attending Gateway Day Treatment Program, where the records reveal that Plaintiff was smoking synthetic marijuana, "which activated his [mental] illness," yet Plaintiff continued to smoke drugs, even though "[he] was having repeated psychotic episode…." Id. at 720. Tellingly, Plaintiff admitted to Dr. Odunlami that his drug usage exacerbated his mental health symptoms. For example, Plaintiff candidly admitted "that [marijuana] makes him very paranoid." Id. at 569. In addition, while high on synthetic marijuana, Plaintiff complained to Dr. Odunlami about worsening symptoms of anxiety, restlessness and irritability. Id. at 564.

Moreover, the ALJ concluded that Plaintiff's bipolar disorder showed marked improvement when he stopped consuming illicit drugs and complied with his medication regimen. Id. at 15-16. The ALJ relied on Dr. Odunlami's treatment records. Id. at 16. Dr. Odunlami specifically reported that, when Plaintiff regularly takes his medication, he showed no signs of serious mental abnormalities and his erratic behavior stabilized. Id. at 354, 572. Similarly, Dr. Kelse reported that, when Plaintiff denied any substance abuse, he presented no symptoms of anxiety or depression. Id. at 581. Furthermore, the ALJ relied on Dr. Kousa's November 2013 report.[3] Id. at 16. Dr. Kousa noted that Plaintiff was complying with his

---

[3] The Third Circuit has explained that "[t]he Social Security Administration advises adjudicators assessing whether an individual's substance abuse problems were a factor material to the disability determination that '[t]he most useful evidence . . . is that relating to a period when the individual was not using drugs/alcohol.'" Mirabile, 354 Fed. Appx. at 622 (alteration in original) (citation omitted). In the instant matter, Dr. Kousa's report is useful because Plaintiff had experienced a long period of abstinence from drug abuse. A.R. at 16, 35.

medication regimen, and that he reported feeling better because his "anxiety is not as bad as it used to be." Id. at 753. Dr. Kousa found that Plaintiff was alert, calm, and cooperative. Id. His speech was fast, but otherwise normal. Id. He was in a good mood, and his affect was congruent and broad. Id. Plaintiff was fully oriented, and his thought form was logical and linear. Id. Plaintiff, at that time, denied any hallucinations or delusions, and his insight and judgment were good. Id. In a separate report, Dr. Kousa noted that Plaintiff stated that "[he] do[es] well as long as [he] take[s] [his] medications." Id. at 733.

Finally, notwithstanding other medical records to the contrary, Plaintiff contends that Dr. Arrington's July 2012 report and opinions conclusively establish that he is disabled.[4] Id. at 700-01. However, that argument is misplaced. The ALJ provided some weight to Dr. Arrington's opinion that "[t]he results of the present evaluation appear to be consistent with psychiatric problems, which may significantly interfere with [Plaintiff's] ability to function on a daily basis." Id. at 16, 700-01. However, Dr. Arrington did not specify the cause of the "psychiatric problems," i.e., whether his problems were caused solely by his mental issues and/or his substance abuse. Indeed, the ALJ specifically noted that Dr. Arrington opined that Plaintiff's mood disorder was induced by his substance abuse. This opinion is consistent with the ALJ's determination that Plaintiff's drug usage is a contributing factor material to the determination of disability. The ALJ also appears to give some weight to Dr. Arrington's opinion that "[Plaintiff] is able to follow and understand simple directions and instructions," but had difficulty with attention and concentration. Id. at 702.

---

[4] Under Mirabile, Dr. Arrington's report is less useful than Dr. Kousa's report because, at the time of Dr. Arrington's examination, Plaintiff had only been "clean" for approximately twenty days. Id. at 700-01.

After careful review of the record, there is substantial evidence to support the ALJ's finding that Plaintiff is not completely disabled absent his drug abuse, especially since many of Plaintiff's disabling symptoms are affected by his consumption of drugs. Accordingly, Plaintiff has failed to satisfy his burden of proving disability throughout the drug and alcohol addiction materiality analysis. See Social Security Ruling ("SSR") 13-2P, 2013 S.S.R. LEXIS 2, *11.

**b.      Whether the ALJ Properly Questioned the Vocational Expert**

Plaintiff argues, without citing any legal support, that remand is appropriate because the ALJ "did not include in his hypothetical to the vocational expert that plaintiff would not be able to be at work on a sustained basis due to his required participation in his mental health program five days a week…." Pl.'s Br. at p. 23. Plaintiff maintains that "an individual [such as himself] cannot perform substantial gainful activity if he/she is required to attend an outpatient program four hours a day five days a week." Pl.'s Reply Br. at p. 4. I disagree.[5]

The Third Circuit has explained that, with respect to hypothetical questions posed to vocational experts, "the ALJ may proffer a variety of assumptions to the expert, [but] the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays

_____

[5] Plaintiff also argues that he is not able to perform the job of laborer/ salvage, since "[t]his occupation exceeds the simple, repetitive task restriction placed on plaintiff by the Administrative Law Judge." Pl.'s Br. at p. 23. Assuming that Plaintiff is correct, it is harmless error because Plaintiff is able to perform other jobs that exist in significant numbers in the national economy. See Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) ("We… conclude that a remand is not required here because it would not affect the outcome of the case."). Indeed, Plaintiff does not challenged the ALJ's determination that Plaintiff is able to perform the job of machine feeder or cleaner II. See A.R. at 17-18. The vocational expert testified that, in the national labor market, there are 26,000 machine feeder jobs and 69,000 cleaner II jobs. Id. at 47-48. So long as Plaintiff can perform those types of jobs, under the Act, Plaintiff is not considered disabled. See Plummer, 186 F.3d at 428.

the claimant's individual physical and mental impairments."  Burns v. Barnhart, 312 F.3d 113,

123 (3d Cir. 2002) (internal quotation marks and citation omitted); see 42 U.S.C. § 423(d)(3) (a

physical and mental impairment is defined as "an impairment that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques.").  "A hypothetical question posed to a vocational

expert must reflect all of a claimant's impairments."  Burns, 312 F.3d at 123 (internal quotation

marks and citation omitted).  When the record contains objective medical evidence of specific

impairments not included in a hypothetical question to a vocational expert, "the expert's repose

is not considered substantial evidence."  Id.

Typically, when formulating hypothetical questions, an ALJ must consider whether a

claimant could perform certain occupations given his residual functional capacity, work

experience, education and age.  See Plummer, 186 F.3d at 427-28; see also Walker v. Astrue,

733 F. Supp. 2d 582, 590 (E.D. Pa. Aug. 9, 2010) (stating that "the ALJ typically poses

hypothetical questions to the [vocational expert] asking whether the claimant could perform

certain occupations given [his residual functional capacity], age, education, and past work

experience….") (internal quotation marks and citation omitted).  When a claimant presents

limitations imposed by a mental impairment, and supported by objective medical evidence, the

ALJ must consider four categories of functional limitations: "(1) activities of daily living, (2)

social functioning, (3) concentration, persistence, or pace, and (4) deterioration or

decompensation in work or work-like settings."  Ramirez v. Barnhart, 372 F.3d 546, 551 (3d Cir.

2004); see Mellor-Milam v. Comm'r of Soc. Sec., No. 13-5732, 2014 U.S. Dist. LEXIS 178247,

at *49 (D.N.J. Dec. 30, 2014) (stating that the hypothetical questions "must 'accurately portray'

all of the physical and mental impairments that are supported by objective medical findings in the record.").

In the instant matter, the ALJ concluded that Plaintiff maintained some nonexertional restrictions, even when he stops using drugs, and that "[he] is able to perform work which is simple and repetitive with no direct contact with the public." A.R. at 13, 15. That determination is supported by Dr. Arrington's opinion that "[Plaintiff] is able to follow and understand simple directions and instructions." Id. at 702. In addition, Dr. Dadamo, a state agency psychologist, opined that Plaintiff is not disabled. Id. at 67. In reaching that opinion, Dr. Dadamo found that Plaintiff is "best equipped" for work with two or three step directions, and that "[h]e is able to focus adequately upon routine job tasks." Id. at 65. Dr. Dadamo also found that "[l]imitations in stress tolerance and practical judgment limit [Plaintiff] to jobs where the changes in routine are modest and he does not have to exercise a lot of independent judgment." Id. at 66. Based on that evidence, the ALJ correctly posed several questions to the vocational expert about Plaintiff's ability to perform work-related activities. Id. at 46-49.

While Plaintiff argues that his participation in a mental health and substance abuse program should have been included in the hypothetical questions posed to the vocational expert, that argument must fail. In connection with a residual functional capacity determination, an ALJ may consider the effects of attending treatment, such as the "frequency of treatment, duration [or] disruption to routine…." SSR 96-8P, 1996 SSR LEXIS 5, at *13-14. However, an ALJ is not required to question the vocational expert about restrictions imposed by ongoing medical or mental health treatment, unless there is objective medical opinion evidence in the record that the claimant must attend such treatment for a prescribed period of time, and that there is a likelihood of absenteeism due to the frequency of the appointments. See Burns, 312 F.3d at 123; see also

Robinson v. Astrue, No. 10-689, 2011 U.S. Dist. LEXIS 144541, at *14 (S.D. Ohio Oct. 12, 2011) ("No physician or other medical source opined about the likelihood of absenteeism required for Plaintiff's medical treatment."), report and recommendation adopted, No. 10-689, 2011 U.S. Dist. LEXIS 144546 (S.D. Ohio Dec. 14, 2011); Walker v. Astrue, No. 03-0078, 2008 U.S. Dist. LEXIS 124728, at *33 (M.D. Tenn. Sept. 24, 2008) ("Though a treating physician's opinion regarding a plaintiff's expected rate of absenteeism may be entitled to deference, there was no such opinion from a treating physician in this case."), report and recommendation adopted, No. 03-0078, 2008 U.S. Dis. LEXIS 84791 (M.D. Tenn. Oct. 21, 2008).

In this case, Plaintiff argues on appeal that he must attend outpatient program for four hours a day five days a week. In support of that argument, Plaintiff relies on his own testimony from the hearing. Plaintiff specifically testified that he was attending CPC Behavioral Healthcare for mental health and substance abuse treatment, which included a group counseling component, and that he goes "five days a week, Monday through Friday." A.R. at 35-36. However, Plaintiff has failed to present any medical opinion – from Dr. Odunlami or any other medical source – during the administrative process that he is medically required to attend mental health and substance abuse treatment, and that his required attendance in such a program would render Plaintiff unemployable. Although the ALJ noted that "[Plaintiff] spends his days going to drug rehab 5 days a week," see id. at 16, the Court notes that Plaintiff has not presented any evidence that he must continue with his mental health and substance abuse program indefinitely, or that he could not adjust his schedule to accommodate both his treatment and work responsibilities. More importantly, no physicians have even suggested that Plaintiff must attend certain mental health and substance abuse programs for a particular period of time to treat his illnesses. Without such medical opinion evidence, the ALJ did not err in refraining from asking

the vocational expert about Plaintiff's participation in the mental health and substance abuse program. In fact, "it would be error to include limitations not credibly established by the record when relying on a vocational expert's testimony to make a disability determination." Chiucchi v. Comm'r of Soc. Sec., No. 15-2460, 2016 U.S. Dist. LEXIS 173259, at *25 n.4 (D.N.J. Dec. 15, 2016).

In addition, the issue of absenteeism was addressed by the ALJ when he asked the vocational expert to "assume [an] individual would, for a variety of reasons, not be able to work three or more days per month on an unscheduled basis." A.R. at 47. Based on that question, the vocational expert concluded that there would be no jobs for such an individual. Id. Ultimately, the ALJ determined that Plaintiff did not suffer from this limitation because, when he stopped using drugs and complied with his medication regime, Plaintiff was capable of performing light work with minor restrictions. Id. at 13, 15. This Court has already found that the ALJ's residual functional capacity determination was supported by substantial evidence, and as such, the ALJ's rejection of more extensive limitations as to the number of days Plaintiff could work was also supported by the evidence. See Chiucchi, 2016 U.S. Dist. LEXIS 173259, at *25 n.4.

IV.     CONLCUSION

For the reasons set forth above, the Court finds that the ALJ's decision is supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed, and Plaintiff's Complaint is dismissed.


DATE: May 25, 2017                                    /s/ Freda L. Wolfson
                                                      The Honorable Freda L. Wolfson
                                                      United States District Judge